An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-1179

Filed 5 August 2026

Rockingham County, No. 23JT000217-780

IN THE MATTER OF: N.N.L., a minor juvenile.

Appeal by respondent-father from order entered 31 July 2025 by Judge James A. Grogan in Rockingham County District Court. Heard in the Court of Appeals 21 July 2026.

> *Jack T. Brock II, for appellant-respondent-father.*

> *Joint brief filed by Hedrick Gardner Kincheloe & Garofalo, by M. Duane Jones, for Guardian ad Litem, and Reeves Divenere Wright, by Anné C. Wright, for petitioner-appellee Rockingham County Department of Social Services.*

PER CURIAM.

Respondent-father ("Father") appeals from order terminating his parental rights to his daughter, Nadine.[1] For the following reasons, we affirm the trial court's order.

I.      Background

---

[1] A pseudonym is used to protect the identity of the minor child.

Nadine was born in October 2023. The day after she was born, the Rockingham County Department of Health and Human Services, Division of Social Services ("DSS") received a neglect report on Nadine. The report alleged that at the time of her birth, Nadine tested positive for benzodiazepines, marijuana, and amphetamines. Nadine's mother ("Mother")[2] tested positive for benzodiazepines and marijuana. Additionally, Mother had been prescribed Subutex and Xanax, which made her lethargic. While in the hospital, Mother was alone, appeared to have little support, and was seen dozing off while holding Nadine.

After receiving the report, a DSS social worker visited Mother and confirmed that she had a history of substance use dating back to 2019. Mother admitted to recent substance use including marijuana and Adderall. Mother also had a mental health history that included self-harm and suicidal ideation. Mother had been previously diagnosed with Bi-Polar Disorder and had not consistently engaged in treatment sufficiently to manage her mental health. When asked about Nadine's biological father, Mother identified another man who was later confirmed to not be Nadine's father through genetic testing.

DSS filed a juvenile petition on 30 October 2023 alleging that Nadine was a neglected and dependent juvenile. That same day, DSS requested and received

---

[2] Mother is not a party to this appeal.

nonsecure custody of Nadine. Mother identified three possible caregivers for Nadine, but each declined to care for her. Nadine was placed in foster care.

The trial court held a hearing on the juvenile petition on 29 February 2024 and adjudicated Nadine a neglected and dependent juvenile. The trial court then held permanency planning hearings on 28 March and 18 April 2024. Following the April hearing, the trial court set Nadine's permanent plan as adoption with a secondary plan of custody. On 16 June 2024, DSS filed a Motion for Termination of Parental rights as to Mother and the then-unknown biological father of Nadine.

On 3 September 2024, DSS received a letter from Father indicating that he may be Nadine's biological father and requesting the completion of genetic testing. Father also requested that Nadine be placed with his mother until he was able to care for Nadine himself. At the time the letter was received, Father had been incarcerated in Virginia since 2 June 2024 for charges related to felony possession of cocaine with the intent to distribute, felony eluding police over 20 miles per hour over the limit, and misdemeanor fleeing from law enforcement. Father later pled guilty to those charges on 10 December 2024 and was projected to be released in December 2025. Father also had a history of criminal convictions in North Carolina dating back to 2012 and pending charges related to misdemeanor possession of a schedule IV substance and misdemeanor possession of drug paraphernalia in Rockingham County.

Genetic testing was completed on 31 October 2024 and the trial court adjudicated Father as Nadine's biological father on 16 January 2025. DSS assessed Nadine's paternal grandmother for possible placement per Father's request but could not approve her for placement due to her own history with Child Protective Services. Father did not identify any other potential placements for Nadine.

On 23 January 2025, DSS filed a Motion for Termination of Parental Rights against Father. A hearing was held on 3 July 2025. In an order entered 31 July 2025, the trial court found that Father had not entered into a case plan to reunify with Nadine, had never visited or otherwise met Nadine, had never provided for the support of Nadine or sent any cards or gifts, and had not initiated any further contact with DSS since his initial letter in September 2024. The trial court concluded that there were grounds to terminate Father's parental rights based on neglect and dependency. Additionally, the trial court determined that termination of Father's parental rights was in Nadine's best interest due to her lack of a relationship with Father and a high likelihood of adoption by her foster family.

According to an affidavit from Father's trial attorney, Father's counsel contacted DSS on 31 July 2025 and alerted them that Father intended to appeal the order. Father's counsel also asked for a copy of the order as soon as it was signed. The order terminating Father's parental rights was served via U.S. Mail on 20 August 2025.

After receiving the order, Father's counsel mailed a drafted Notice of Appeal to Father at the facility where he was incarcerated. The mailed draft was rejected by the facility and returned to Father's counsel with instructions for him to send to a central mail processing center. Father's counsel resubmitted the drafted notice but by the time it arrived, Father had been temporarily removed from the facility so he could testify in another trial. When Father received the drafted Notice of Appeal, he signed it and mailed it back to his counsel. Father's counsel then filed the Notice of Appeal as soon as possible, on 26 September 2025. Father's counsel filed a petition for writ of certiorari with this Court on 20 January 2026.

## II.    Discussion

On appeal, Father contends the trial court erred in terminating his parental rights and argues that his incarceration, standing alone, is insufficient to support the grounds of neglect and dependency. We first address Father's petition for writ of certiorari.

### A.    Father's Petition for Writ of Certiorari

Father concedes that his notice of appeal was untimely because it was filed more than 30 days after the filing and service of the termination order. Father requests that this Court issue a writ of certiorari due to the gravity of the right at stake and the fact that the late filing of the notice of appeal was due to circumstances beyond his control.

Failure to timely appeal is a jurisdictional error that requires this Court to dismiss the appeal. *See Bradley v. Cumberland Cnty.*, 262 N.C. App. 376, 382 (2018). Parties have 30 days after entry and service of an order terminating parental rights to file a notice of appeal. N.C.G.S. § 7B-1001(b) (2025). However, even when the right to appeal "has been lost by failure to take timely action," this Court may issue a writ of certiorari and review the lower court order. N.C. R. App. P. 21(a)(1).

Certiorari is a discretionary writ which may "be issued only for good or sufficient cause shown," and must "show merit or that [petitioner] has reasonable grounds for asking that the case be brought up and reviewed on appeal." *In re Snelgrove*, 208 N.C. 670, 671–72 (1935) (citation omitted). "A showing that the right of appeal has been lost through no fault of the petitioner is generally sufficient to support the issuance of a writ of certiorari." *Eberhardt v. Meletich*, 300 N.C. App. 126, 129 (2025) (cleaned up). Additionally, "this Court may issue a writ of certiorari for an untimely filing of a notice of appeal when there was a clear intent to appeal on behalf of the petitioner." *Id.* at 130.

Here, the order terminating Father's parental rights was not served until 20 August 2025, almost three weeks after the order was entered. Father signed and returned his notice of appeal as soon as he was able, and the delay in filing was caused by issues processing the mail and Father being temporarily removed from the facility to testify at trial. Accordingly, Father has demonstrated that the untimely nature of his appeal occurred through no fault of his own. Additionally, Father's intent to

appeal was made clear when his counsel emailed DSS on 31 July 2025 and DSS will not be prejudiced by our hearing the appeal. Therefore, we exercise our discretion and allow Father's petition for writ of certiorari.

## B.    Standard of Review

"We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.'" *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). When a finding of fact is supported by clear, cogent, and convincing evidence, it is "conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019) (citation omitted). Unchallenged findings of fact made by the trial court are binding on appeal. *In re Z.V.A.*, 373 N.C. 207, 211 (2019). Meanwhile, the trial court's legal conclusions are reviewed de novo. *In re I.M.S.*, 298 N.C. App. 689, 694 (2025). Finally, where a trial court finds multiple grounds for termination, and this Court agrees that at least one ground supports this conclusion, "it is unnecessary to address the remaining grounds." *In re P.L.P.*, 173 N.C. App. 1, 8 (2005) (citation and quotation marks omitted).

## C.    Neglect

"A trial court may terminate parental rights if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101." *In re M.S.E.*, 378 N.C. 40, 47 (2021) (citing N.C.G.S. § 7B-1111(a)(1)). A neglected juvenile is defined,

in relevant part, as a juvenile whose parent "[d]oes not provide proper care, supervision, or discipline" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2026). Termination of parental rights may be "based on neglect that is currently occurring at the time of the termination hearing" or, if the child has not been in the custody of the parent for a significant time prior to the termination hearing, "a likelihood of future neglect by the parent." *In re B.R.L.*, 379 N.C. 15, 21 (2021) (citations omitted).

To determine whether future neglect is likely, " 'evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights[.]' " *In re M.S.E.*, 378 N.C. at 48 (quoting *In re Ballard*, 311 N.C. 708, 715 (1984)). Our Supreme Court has held that a prior adjudication of neglect is still relevant even where the neglect was based on a mother's actions while the father was incarcerated. *See In re M.A.W.*, 370 N.C. 149, 153 (2017). Indeed, " '[i]n determining whether a child is neglected, the determinative factors are the circumstances and conditions surrounding the child, not the fault or culpability of the parent.' " *Id.* (quoting *In re Montgomery*, 311 N.C. at 109) (alteration in original). The trial court must also "consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.G.J.*, 378 N.C. 500, 509 (2021) (quoting *In re R.L.D.*, 375 N.C. 838, 841 (2020)). "A parent's failure to make progress in completing a case

plan is indicative of a likelihood of future neglect." *In re M.J.S.M.*, 257 N.C. App. 633, 637 (2018) (citation omitted).

"[I]ncarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision." *In re K.N.*, 373 N.C. 274, 282 (2020) (citations omitted). "Thus, respondent's incarceration, by itself, cannot serve as clear, cogent, and convincing evidence of neglect." *Id.* at 282–83. "Instead, the extent to which a parent's incarceration or violation of the terms and conditions of probation support a finding of neglect depends upon an analysis of the relevant facts and circumstances, including the length of the parent's incarceration." *Id.* at 283.

Additionally, " '[a]lthough a parent's options for showing affection while incarcerated are greatly limited, a parent will not be excused from showing interest in the child's welfare by whatever means available.' " *In re M.S.A.*, 377 N.C. 343, 348 (2021) (quoting *In re C.B.C.*, 373 N.C. 16, 19-20 (2019)) (affirming termination of respondent-father's parental rights on the ground of abandonment). This Court has previously affirmed a termination of a father's parental rights based on neglect in part because during his incarceration he did not write to the child, made no efforts to provide for the child, and did not provide any love, nurture, or support for the minor child. *See In re P.L.P.*, 173 N.C. App. at 10–11.

Father compares his case to *In re K.N.* and argues that the trial court improperly relied on his incarceration to terminate his parental rights and that the trial court's conclusion is otherwise unsupported by its findings of fact. In *In re K.N.*,

our Supreme Court held that a trial court erred by terminating the parental rights of a respondent-father on the basis of neglect. 373 N.C. at 275. There, the only factual finding that directly addressed the respondent-father's ability to care for the child stated that "although respondent had secured suitable housing, he was incarcerated at the time of the proceeding and awaiting trial on a number of charges." *Id.* at 282. Meanwhile, other findings of fact suggested that the respondent-father had complied with several provisions of his case plan. *Id.* at 282. The Court noted that there was other evidence in the record that may have been sufficient to support the finding of a future likelihood of neglect, including the respondent-father's history of drug abuse and extensive criminal record. *Id.* at 284. However, the trial court did not incorporate any of that evidence into its findings of fact and thus the findings did not support its conclusion that there were grounds to terminate the respondent-father's parental rights. *Id.* at 284–85.

The instant case is readily distinguishable from *In re K.N.* Here, the trial court did not solely rely on Father's incarceration to support its termination of his parental rights. Rather, it made several additional unchallenged findings of fact:

> 28. Additionally, respondent father had pending charges related to misdemeanor possession of a schedule IV substance and misdemeanor possession of drug paraphernalia in Rockingham County, North Carolina at that time.
> 29. Respondent father has a significant history of criminal convictions in the State of North Carolina dating back to 2012 for drug related offenses, including, but not limited to, felony trafficking a schedule II substance, felony

possession with intent to sell or deliver a schedule IV substance, possession of a schedule IV substance, and use or possession of drug paraphernalia.

30. Due to respondent father's criminal history, the Department believes respondent father likely has outstanding needs related to parenting skills and substance use.

. . . .

33. Following confirmation that respondent father was the biological father to the minor child, the Department began an assessment of the minor child's paternal grandmother, [Ms. B.], for possible placement of the minor child per respondent father's request; however, upon conducting the necessary background search on [Ms. B.], the Department was unable to approve her for
placement due to her own prior CPS history.

34. Since the denial of placement with [Ms. B.], respondent father has not identified any other potential placements for the minor child. Respondent father has initiated no contact with the Department since sending the initial letter indicating that he may be the biological father to the minor child.

. . . .

37. As of the time the underlying Motion was filed, respondent father had not entered into a case plan to reunify with the minor child.

38. As of the time the underlying Motion was filed, respondent father had never visited, or otherwise met, the minor child.

39. As of the time of [sic] the underlying Motion was filed, respondent father had never provided for the support of the minor child, sent any cards or gifts to for [sic] the minor child, or otherwise acknowledged any holidays or special occasions for the minor child.

40. As of the date of this hearing, respondent father has initiated no further contact with the Department regarding the minor child since his letter received in September 2024.

41. As of the date of this hearing, respondent father has not identified a plan for himself upon his release from custody, has not identified another alternative plan of care for the minor child, and has not inquired about the minor child.

42. As of the date of this hearing, respondent father has taken no substantial steps towards reunification with the minor child.

43. Due to respondent father's lack of participation in reunification efforts with the minor child, respondent father's strengths and needs remain unknown at this time, though the Department suspects he has outstanding needs related to substance use and parenting skills. Respondent father's lack of effort towards reunification with the minor child prevent the minor child from safely reunifying with respondent father. The minor child would be at substantial risk of further abuse, neglect, and/or dependency if returned to the care of the respondent father.

While Father's incarceration hindered his ability to nurture a relationship with Nadine, it does not act as a shield to fully excuse him from doing so or from taking an interest in her welfare. Father was in frequent communication with his attorney and other family members during his incarceration and yet did not reach out to DSS or Nadine after his initial letter. Additionally, the trial court noted concerns of substance use, Father's inability to identify a suitable placement for Nadine, and Father's lack of participation in reunification efforts. These findings by the trial court are binding on appeal and provide sufficient support for the trial court's conclusion that there was a likelihood of future neglect if Nadine was returned.

Accordingly, we hold that the trial court did not err in finding that there were grounds to terminate Father's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1). Since only one ground is needed in order to terminate parental rights, we do not consider whether the trial court erred in concluding there were also grounds to terminate Father's parental rights pursuant to N.C.G.S. § 7B-1111(a)(6).

III.     Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Father's parental rights.

AFFIRMED.

Panel Consisting of Judges ARROWOOD, COLLINS, and MURRY.

Report per Rule 30(e).